# SUPREME COURT

OF

# PENNSYLVANIA.

SOUTHERN DISTRICT, SEPTEMBER TERM, 1817.

1817.

GALBRAITH and another *against* FENTON and wife. *Chambersburg.*

IN ERROR,

*Monday,*
September 29.

ERROR to the Common Pleas of *Cumberland* county.

This was an ejectment by *James Fenton* and wife, the plaintiffs below, against *Elijah Galbraith* and *Alexander Watt.* The evidence which was given on the trial in the Court below was placed on the record, and by that it appeared, that *Samuel Galbraith*, deceased, had conveyed sundry tracts of land to his sons, *Elijah*, *John*, and *William*, by several deeds, dated about the 8th *May*, 1810. *Samuel Galbraith* had also a daughter, *Sarah*, the wife of *James Fenton*, one of the plaintiffs. Sometime in the month of *April*, 1812, two deeds were executed; one by the three sons of *Samuel Galbraith*, and the other by *Samuel* himself, in the following words:

" We, the underscribers, do bind ourselves, our heirs, and assigns, in the penal sum of the fourth part of all the real estates

A, had conveyed lands to his three sons. Afterwards the three sons, by writing under seal, bound themselves in the penal sum of the fourth part of all the real estates of their father, to their sister and her husband, or her issues, when all their father's lawful debts were paid, "from all the estates I own or ever owned, according to their value at this time," *held,* that the writing did not operate as a conveyance of land, or a burthen on it, but constituted a personal covenant.

It seems if there is a clear intent to make land chargeable with money, ejectment may be supported, when it is the most convenient, or only way of compelling payment from the proceeds of the land.

1817.

GALBRAITH
and another
v.
FENTON
and wife.

of our father, *Samuel Galbraith*, to *Sarah* and *James Fenton*, or her issues, when all the said *Samuel Galbraith*'s lawful debts are paid, from all the estates I own, or ever owned, according to their value at this time.

"*ELIJAH GALBRAITH.*     (L. S.)
"*JOHN GALBRAITH.*      (L. S.)
"*WILLIAM GALBRAITH.*   (L. S.)

"*N. B.* A peaceable living, and a decent burial, is all I will ever demand of any of you four; from under my hand and seal.

"*SAMUEL GALBRAITH.* (L. S.)
"*April*, 1812.

"Signed and sealed in presence of us,
"*JOHN FENTON.*"

The President of the Court of Common Pleas gave in charge to the jury, that the deed of the sons of *Samuel Galbraith* created a lien on the lands which their father had conveyed to them, and therefore *Fenton* and wife might maintain this ejectment, for the purpose of compelling payment of the money due to them, by virtue of the deed; and a verdict was found for the plaintiffs; the plaintiffs having previously filed a paper specifying certain terms by which they would be bound, in case the verdict was in their favour.

*Watts*, for the plaintiff in error, contended, that the writing of *April*, 1812, did not affect the land. If it had any effect, it was a personal obligation, binding the obligors to pay one-fourth of the value of the real estate of their father, *Samuel Galbraith.* His lands had been since taken in execution for his debts, and sold. The land for which this ejectment was brought was, in *April*, 1812, no part of the estate of *Samuel Galbraith;* he had conveyed it to his sons two years before. Binding themselves in a penal sum, is language inconsistent with the idea of a conveyance of land.

*Metzgar* and *Carothers*, contra.
These writings are a family settlement, for a good consideration, that of blood. There was also a valuable considera-

tion, inasmuch as *Samuel Galbraith* relinquished to the sons all that they owed him ; and they owed the consideration money for the lands. The two writings are to be considered as one. 1 *Johns. Cas.* 98. The father had a lien for the purchase money, which he relinquished, and therefore the money to be paid to the daughter was a lien. *Sugd.* 354, 355. 2 *Eq. Ca. Ab.* 682. 6 *Binn.* 118. And unless there be a lien, the daughter may lose her portion. Here the direction is, that the daughter's share should be paid "*from*" the land, which is the same as *out of* the land ; and the latter words would constitute a lien. It is the duty of Courts, in construing deeds, to effectuate the intent of the parties. 2 *Wils.* 78. 1 *Hen. & Munf.* 447.

1817.

GALBRAITH and another *v.* FENTON and wife.

TILGHMAN C. J. The writings on which this question arises, are very obscure ; but it is certain, that they cannot operate as a conveyance of land. The intention of the father is plain, to require nothing from his children, but a decent maintenance during life, and burial after death. What estate he had, or whether he had any thing remaining after the conveyances to his sons, executed two years before, does not appear. The sons, on their part, undertook, by the writing now under consideration, to pay their father's debts out of the estate which then belonged, or had before belonged to him ; and also to pay to their sister, *Sarah Fenton*, and her husband, one-fourth part of the value of all their father's real estate, (including what had been conveyed to them,) after all their father's lawful debts should be paid. The father's real estate to be estimated, according to its value at the time of executing the writings. If I could clearly perceive an intent to make the real estate chargeable with the money to be paid to *Fenton* and his wife, I should think that this ejectment might be supported ; because it would be the most convenient, and perhaps the only way of procuring payment from the proceeds of the real estate. But I do not perceive such intention ; and the Court has no right to throw a burthen on the land of the *Galbraiths*, without their consent, merely because it would be for the benefit of their sister. The brothers agree to pay their father's debts, *from all the estates he then owned or ever owned.* The words *from all the estates,* &c. refer to the *payment of the debts,* and not to the payment of the *one-fourth to their sister.* To apply them to the pay-

VOL. III.—Z z

1817.

GALBRAITH
and another
v.
FENTON
and wife.

ment to the sister, is a forced construction which cannot be supported without changing the order of the words, or, (as the plaintiff's counsel wish,) introducing a parenthesis, which is in fact to alter the writing. The great object of the parties was, to bind the sons to pay one-fourth of the value of the father's estate to their sister ; and this is done, and there is a remedy by action of covenant. If it had been intended to create a lien, by way of security, it would have been easy to say so. If the plaintiffs should lose any part of their money, I shall be sorry for it ; but there is no justice in giving security to them, at the expense of others. Not being able to discover in these writings, any thing which, in fair construction, operates as a charge upon the lands, in favour of the plaintiffs, I am of opinion, that the ejectment cannot be supported, and therefore the judgment should be reversed.

GIBSON J. The question turns on the construction of the writing executed in *April*, 1812, in favour of the plaintiffs, by *Elijah*, *John*, and *William Galbraith*. If a lien was created on the land, previously conveyed to them by their father, there is no doubt its payment can be enforced in *Pennsylvania* by the action of ejectment. To ascertain the meaning of the parties, we must confine ourselves to the paper itself, for nothing extrinsic can be resorted to ; and if the meaning be plain, the Court will disregard particular expressions, unless they have a definite legal operation, inconsistent with such meaning. But unless the grantors unequivocally intended to charge the land with the payment of the money secured to the plaintiffs, this action cannot be sustained. In the construction of deeds an intention resting on no better ground than conjecture, is of no avail. It is very certain the plaintiffs were to have *money* and not *land*. But it is inferred, that the money was to be paid out of the land. To support this construction, it will be necessary to read this papers "if the clause respecting *Samuel Galbraith*'s debts were ́sck out, or inclosed in a parenthesis. But that reading will not make sense. To say a man binds himself in a sum, *from* all his estates, is nonsense ; and to make it intelligible, the words " *to be paid*," or " *payable*," must therefore be supplied, which would be to take a liberty with this act of the parties, that I am not disposed to do. It is much more simple to read the words in the order in which they stand, which obviates the necessity of doing vio-

lence to any word in the paper to make sense of it; so far at least as its meaning is concerned. The pronoun, "I," in the last clause, may be applicable to *Samuel Galbraith*, the father, whose name is on the paper, although he cannot be considered as a party, or it may be applicable to the obligors severally; the last is my construction. The paper becomes then quite intelligible, when we understand the parties as promising to pay a sum equal to one-fourth of the value of all the estate, when their father's debts should be paid thereout. But then it may be asked, what effect is to be given to the concluding words, "*according to their value at this time?*" To this I answer, that as no definite sum was mentioned in the obligation, it was essential to furnish a rule to go by, when the amount should come to be ascertained. The value of land fluctuates. Was the portion of the sister to be a fourth of the value, at the time of executing the writing, deducting a sum equal to what the father should afterwards be found indebted, or a fourth of the value at the time when those debts should be liquidated? This might be the subject of an after dispute, and it was to guard against it that these words were introduced. The meaning then, though very inelegantly expressed, is plainly this:—The three brothers bind themselves, to their sister and her husband, to pay a sum equal to one-fourth of the present value of their lands, deducting a sum equal to what their father's debts should afterwards be ascertained to amount to. But even should the construction contended for by the counsel be deemed more plausible, still I hold, that in construing a deed, it is not the business of a Court to grope after the meaning, when the deed will have effect without it. This writing will clearly operate as an obligation binding the person; but we are not to charge a man's land by guess.

DUNCAN J. gave no opinion, having been counsel in the cause.

*Judgment reversed.*